UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~

In re:
**JOHN F. CULLEN,**                              Chapter 13
    Debtor                              Case No. 11-17823-JNF

~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

    The matter before the Court is the Motion for Summary Judgment on Contested Matters filed by Mercantile Bank and Trust Company (the "Bank" or "Mercantile").[1] The contested matters are the Bank's Objection to the Chapter 13 plan filed by John F. Cullen ("Cullen"or the "Debtor"), and Cullen's Objection to the Bank's proof of claim  Cullen filed an Opposition to the Motion for Summary Judgment but did not file, in accordance with MLBR 7056-1, a concise statement of the material facts of record as to which he contends that there exists genuine issues to be tried, with page references to affidavits, depositions and

---

[1] Counsel represented at the November 15, 2012 hearing that the Bank merged with Commerce Bank & Trust Company on August 24, 2012.  In view of the submissions made by the parties in Mercantile's name, the Court shall continue to refer to the Bank as Mercantile.

1

other documentation, although he did attach an affidavit and other exhibits to his Memorandum in Support of his Opposition.

The Court heard the Bank's Motion and Cullen's Opposition on November 15, 2012. Following the hearing, the Bank filed a Post-Hearing Memorandum; Cullen did not submit a supplemental brief.

The Court finds that there are no genuine issues of material fact and the matter is ripe for summary judgment. *See* Fed. R. Civ. P. 56(a), made applicable to this proceeding by Fed. R. Bankr. P. 7056. The issue presented is whether the parties in executing a Loan Modification Agreement intended to release Cullen from his obligations under his Unlimited Personal Guaranty (the "Guaranty"), an issue which requires this Court to interpret the Guaranty and a Loan Assumption Agreement.

## II. FACTS

Cullen filed a voluntary petition under Chapter 13 on August 18, 2011. He listed the Bank as the holder of an unsecured nonpriority claim on Schedule F and indicated that the claim was contingent, unliquidated and disputed. He did not list any claims against the Bank on Schedule B. Cullen did not provide for treatment of the Bank's claim in his Chapter 13 plan. The Bank objected to the plan on that ground. In addition, it timely filed a proof of claim in the sum of $205,140.52. Its claim relates to a deficiency following a foreclosure sale it conducted on July 15, 2011, with respect to Units C-3 and C-7 and Garage Units 78 and 79, located at Shipways Place Condominium, Charleston, Massachusetts (the "Property"). The Bank attached the following accounting to its proof of claim:

<u>As of Bankruptcy Filing Dated of 08/18/2011</u>

| | |
|---|---|
| Principal and interest | $626,065.31 |
| Appraisals | $ 1,600.00 |
| Attorney's Fees and Costs | $ 9,679.49 |
| Auctioneer Fees and Costs | $ 4,100.00 |
| Auctioneer Commission | $ 9,000.00 |
| Legal Notices | $ 4,695.72 |
| Total Balance Due | $205,140.52 |

(Includes credit of $450,000.00 for proceeds of Foreclosure Sale of Units C-3 and C-7 and Garage Unites 63 [sic], 78 and 79, Shipways Place Condominium, Charlestown, MA conducted on July 15, 2011 and credit [sic]

Cullen executed a promissory note on August 10, 2004 in the principal sum of $680,000. To secure the note, Cullen executed a Commercial Mortgage and Security Agreement on two contiguous commercial condominium units, Units C-3 and C-7 and three deeded parking spaces, Garage Units 63, 78 and 79, at Shipways Place Condominium. In addition, he executed a Collateral Assignment of Leases and Rents and the Guaranty, which was "a condition to the making of the Loan by the Bank." The Guaranty provided in pertinent part that Cullen "irrevocably and unconditionally guarantees to the Bank (a) the full, punctual and prompt payment of all sums payable under the terms of the Note and/or the Security Instruments, whether at maturity or by acceleration or otherwise . . . . and (c) the payment and performance of any and all other notes, instruments and obligations of any nature whatsoever, *whether presently due or hereafter arising* absolute or contingent, joint or several . . . ." (emphasis supplied). In addition, the Guaranty provided that the "the liability of Guarantor hereunder is present, absolute, unconditional, primary, direct and *independent of the obligations of Borrower*;" and that "[t]he liability of Guarantor shall remain and continue

in full force and effect notwithstanding . . .the assignment or transfer of the Note and/or Security Instruments. . . ." (emphasis supplied). Thus, Cullen was both the primary obligor and the guarantor of the note and other obligations.

In late 2006 and early 2007, Cullen became delinquent on his payment obligations to the Bank. After failing to cure his defaults, the Bank commenced foreclosure proceedings. On June 27, 2007, however, Cullen and the Bank executed a Forbearance Agreement. In the Forbearance Agreement, Cullen admitted that he was in default on his obligations to the Bank by placing a second mortgage on Bank's collateral in favor of Blackfoot Capital, LLC. and that he was delinquent in the payment of condominium fees, as well as his payments to the Bank. Pursuant to the Forbearance Agreement, the Bank agreed to defer enforcement of its rights under its note and security instruments and to reinstate the note provided that Cullen pay it the sum of $17,361.09. Cullen executed the Forbearance Agreement individually and in his capacity as Guarantor. The Bank did not release the Guaranty.

In early 2009, Cullen again failed to satisfy his payment obligations. According to the Affidavit of Fred A. McGrane ("McGrane"), a Senior Vice President of the Bank,

> In April of 2009, an individual named Carroll Lowenstein ("Lowenstein"), who represented the Debtor, met with me at Mercantile's offices and suggested that a third party either purchase the Properties or assume the loan obligations as a resolution to the Debtor's default. Mr. Lowenstein introduced an individual named Robert Lockwood ("Lockwood") to Mercantile as a potential third party purchaser or assignee of the Note.
>
> Charles Monaghan, the President and Chief Executive Officer of Mercantile, and I subsequently met with Lockwood and Lowenstein and discussed proposed terms of an assumption agreement.
>
> Thereafter, Mercantile's counsel entered into negotiations with the Debtor's

attorney, William McCarthy of McCullough, Stievator & Plovere, LLP, and with Lockwood, to have Blackstone, [sic] assume the Debtor's primary Loan obligations, with the Debtor to remain as Guarantor of the Loan. Blackstone was a newly created limited liability company.

On or about May 7, 2009, Mercantile, the Debtor and Blackstone entered into a tri-party Loan Assumption Agreement ("Agreement").

At the time of the Loan Assumption Agreement, the outstanding principal balance of the note was $630,275.98. The Loan Assumption Agreement, which was executed by Cullen, as Assignor, Blackstone Financial Holdings, LLC ("Blackstone"), as Assignee, and the Bank provided:

> 2. <u>Assumption of the Loan</u>.
>
>> (a) <u>Consent of Lender</u>. *As of the Effective Date* (as defined below), Lender grants its consent to the transfer of the Property [Units C-3 and C-7 and Garage Units 63, 78 and 79] excluding Garage Unit 63, provided that Lender's granting of consent in connection with this assumption shall not be deemed or construed as a waiver of any provision requiring Lender's consent in the event of any other sale, transfer or conveyance of the Property and the consent of Lender shall be required on all successive occurrences.
>>
>> Lender's granting of consent is conditioned upon:
>>
>> (i) the truth and accuracy of each of the representations and warranties of Assignee and Assignor contained in this Agreement;
>>
>> (ii) the due execution and delivery by Assignee and Assignor of this Agreement and all other documents submitted by Lender to Assignee and Assignor in connection with this Agreement;
>>
>> (iii) the payment to Lender by Assignee of :
>>
>>> (1) the amount of $17,666.33 representing the past due payments, charges and regular payment

> through May 10, 2009 on account of the Loan; and
>
> (2) *Assignor remains liable personally under the terms of the Loan as a Guarantor pursuant to the Guaranty executed by Assignor in connection with the Loan*.
>
> (b) <u>Assumption</u>. As of the Effective Date, Assignee hereby assumes the obligations evidenced by the Note in accordance with the terms of the Note, and all extensions, renewals, modifications, amendments and replacements, if any, thereof (including without limitation the Forbearance Agreement), and agrees to perform and observe all of the Borrower's obligation contained in, and in accordance with the provisions of, the Note and any and all other Loan Documents and agrees to be bound by each and all of the terms and provisions of the Loan Documents, as though the Loan Documents and each of them had originally been made, execute and delivered by the Assignee on August 10, 2004, the date of the Loan, subject to amendments made hereby.

(emphasis supplied). Pursuant to the Loan Assumption Agreement, the Bank agreed to restructure the Loan such that Blackstone would make interest-only payments for five years. Moreover, the Bank agreed to Cullen's conveyance of the Property to Blackstone, with the exception of Garage Unit 63, and to release its mortgage with respect to that unit as it was the parking space used by Cullen for his personal residence. According to McGrane, the release "would have little impact on Mercantile's security for the loan."

The Loan Assumption Agreement set forth 11 conditions to assumption as follows:

7. <u>Conditions to Assumption</u>.

*Each of the following are conditions precedent to Lender's approval of the assumption of the Loan by Assignee under this Agreement:*

> (a) <u>Execution and Delivery of this Agreement</u>. Assignee and Assignor shall have executed, acknowledged, where applicable delivered to Lender this Agreement and any of the documents

6

and instruments required by the terms of the Agreement.

(b) <u>UCC Financing Statement</u>. There shall have been delivered to the Lender for filing with the Suffolk County and the Secretary of State of the State of Massachusetts [sic] a UCC Financing Statement . . . .

(c) <u>Expenses</u>. Assignee shall have paid or provided to Lender satisfactory assurance as to the payment of costs and expenses for which Assignee is liable under the terms of this Agreement.

(d) <u>Representations and Warranties</u>. The continued truth, accuracy and completeness of each of the representations and warranties of Assignee and Assignor set forth in Paragraph 4 [sic] above.[2]

(e) <u>Title Policy</u>. . . .

(f) <u>Lease of Property</u>. Assignee will deliver to Lender a lease with terms reasonably acceptable to Lender of the Property to Boston Financial Corp. as tenant.

(g) <u>Opinions of Counsel</u> . . .

(h) <u>Transfer of Title</u>. The execution, delivery and recording of a deed in form satisfactory to Lender conveying title to the Property excluding Garage Unit 63 to Assignee.

(i) <u>Payment of Late Interest</u>. Lender's receipt of past due interest on the Loan.

(j) Upon the Lender's satisfaction with the financial condition of each of the following individuals: Robert E. Lockwood, Jeffrey Horvitz; and Michele Shafmaster (hereinafter referred to individually or collectively as "New Guarantors"), based upon such financial information and documentation as required by Lender and the execution by each of the New Guarantors of personal Guaranty forms, satisfactory to Lender, in which they will agree to pay and perform all of the obligations of Assignor

---

[2] They were set forth in Paragraph 6.

>and Assignee under the terms of the Loan, Lender will release the Assignor from any personal liability from and after the Effective Date.
>
>(k) Lender will release to Assignor, Garage Unit 63 from the terms of the Mortgage and the Collateral Assignment and will deliver an appropriate partial release instrument for recording.
>
>*The date each of the foregoing conditions is satisfied shall be the "Effective Date" hereunder*. Lender's consummation of the assumption transaction and release from escrow in connection with same shall constitute confirmation that the Effective Date has occurred.

(emphasis supplied). Cullen, pursuant to paragraph 8 of the Loan Assumption Agreement, agreed to release of any and all claims against the Bank, "[a]s of the Effective Date." In addition, the Loan Assumption Agreement provided that "[t]he headings used in this Agreement are inserted solely for the convenience of reference and are not part of, nor intended to govern, limit or aid in the construction of, any term or provision hereof." It also provided that time was of the essence; that the "Agreement, the Loan Documents and the exhibits attached thereto constitute the entire agreement of the Lender, Assignee and Assignor concerning the transactions contemplated by this Agreement and supersede and cancel any and all previous negotiations, arrangements, agreements, understandings or letters of interest or intent;" and that if any provision were to be determined by any court to be invalid the remainder of the agreement would be enforceable.

Cullen, as grantor, executed a deed to Blackstone, as grantee, on April 30, 2009 with respect to Units C-3 and C-7 and Garage Unites 78 and 79. The deed was recorded on May 8, 2009, one day after execution of the Loan Assumption Agreement. The deed provided: "The Grantee agrees to assume all outstanding mortgages and liens on both Parcels as

further consideration of this conveyance, including, but not limited to, a mortgage to Mercantile . . . in the original principal amount of $680,000.00."

According to McGrane, after the Loan Assumption Agreement was executed, the Bank received a Personal Guaranty from Lockwood. McGrane stated, however, that "[d]espite several telephone conversations with Mr. Lockwood as well as three (3) subsequent letters sent by me to Mr. Lockwood after the execution of the Agreement,[3] Mercantile never received Mr. Lockwood's financial information and documentation as required by ¶ 7(j) of the Agreement." In addition, McGrane represented that he never received executed personal guaranties from Jeffrey Horvitz or Michele Shafmaster. Moreover, McGrane indicated that he received several telephone calls from the Debtor's attorney, William McCarthy, inquiring whether the Bank had received the guaranties and financial information and documentation from the New Guarantors. McGrane added that the Debtor neither personally or through his attorney "claimed or suggested to me that the Debtor's Guaranty had been released according to the terms of the Agreement . . . ."

In late 2009, the Bank was served with a Summons and Complaint by the Shipways Condominium Association, in which it alleged that Blackstone had failed to pay condominium fees in the amount of $14,705.30. McGrane, in his Affidavit, stated that he learned that the Association obtained a Boston Municipal Court judgment against Blackstone in the amount of $41,331.79 on October 15, 2010. In addition, he stated that he leaned that the City of Boston recorded an instruments of taking for unpaid real estate taxes for fiscal

---

[3] The letters were dated May 27, 2009, June 25, 2009, and August 13, 2009.

year 2009 in the sum of $8,592.87 and that the Massachusetts Department of Revenue had recorded two Notices of Tax Lien on February 17, 2010 against Lockwood as Blackstone's alter ego in the sum of $2,000,543.53.

Because of the defaults by Blackstone, on February 3, 2011, the Bank made written demand on Blackstone and Cullen. In its letter to Cullen, it stated:

> As the Guarantor of the Loan, demand for payment is made on you, without waiving any other rights which the Bank may have under provisions of the Note, Mortgage, Assignment of Rents of any other Loan documents, or at law, including without limitation the right to institute collection or foreclosure proceedings or any other remedy to which the Bank may be entitled.

Neither Blackstone nor Cullen cured the existing defaults and the Bank commenced foreclosure proceedings. McGrane in his Affidavit represented that the Bank obtained an appraisal of the Properties, and, in addition to publishing notices of the sale, heavily advertised the sale in the *Boston Globe*, *Boston Herald*, *New England Real Estate Journal*, *Banker and Tradesman*, and *Charlestown Patriot-Bridge*.

Lockwood filed a Chapter 11 petition on May 13, 2010 (Case No. 10-15249-HJB). His case was converted to a case under Chapter 7 on October 22, 2012. Blackstone filed a Chapter 11 petition on October 20, 2011 (Case No. 11-19890-HJB). Its case was converted to a case under Chapter 7 on November 14, 2012. The Bank filed a proof of claim in the sum of $205,140.52 in its case.

With respect to the negotiations surrounding the Loan Assumption Agreement, Lowenstein, in an Affidavit attached to Cullen's memorandum, averred: "it was never contemplated nor understood by me, or by the Debtor, that the Debtor would remain

10

obligated after consummation of the Loan Assumption Agreement;" and "I never understood that the Bank expected the Debtor to remain obligated to it even after title to the collateral was transferred to Blackstone, and I never communicated such a fact to the Debtor."

Cullen, at least prior to the commencement of his bankruptcy case, believed he remained liable to the Bank under his Guaranty. He testified at a deposition taken on March 3, 2010 in In the Matter of the Tax Liability of Robert E. Lockwood, Boston Financial Corporation and Blackstone Financial Holdings, LLC as follows:

> The thing was he [Lockwood] wasn't interested in buying it, but he was interested in taking the property by assignment, okay, with Mercantile's consent. He would pay basically a small - - he was basically paying the interest on the note, I think for five or seven years, and I told the bank that - - the bank told him, I'm not sure, that they took his financials and then they wanted to other cosigners and he gave them the names in here.
>
> When that happened the bank released me fully from the liability of the unit [the Guaranty]. It never happened. So I still have a liability for the unit if he [Lockwood] defaults for some particular reason.

In his Objection to the Bank's proof of claim, Cullen asserted that he has no financial obligation to the Bank; that the Bank breached its contractual obligations to him "by partially completing agreed terms under the assignment to Blackstone;" adding that the Bank's failure to grant him a release constitutes fraud in the inducement, as well as a violation of Ch.93A.

### III. POSITIONS OF THE PARTIES

A. Cullen

Cullen argues that the essence of the Loan Modification Agreement is in paragraph 2 where the Bank consented to Blackstone's assumption of his obligations and agreed to the

conveyance of the Property to Blackstone. Emphasizing his unconditional release of any claims against the Bank, he states "the Debtor forfeited his interest in the Shipway [sic] Property and waived any claims he may have had against the Bank in return for "nothing?" He adds: "Such a construction defies logic, and Mr. Lowensteins's affidavit sets forth his understanding of the Debtor's goals at the time, which are consistent with the Debtor's position today."

Cullen also asserts that the condition set forth in ¶ 7(j) is "surplusage because it anticipates the addition of two additional guarantors who never materialized and who were not parties to the contract," noting that the Loan Assumption Agreement contains no timetable on the satisfaction of the condition, and contains no language as to the remedy for failure of the condition, rendering the Loan Assumption Agreement ambiguous and requiring the denial of summary judgment.

Arguing that performance is the best indicator of what the parties meant, the Debtor contends that the Bank's inaction with respect to ¶ 7(j) evidenced its intention not to enforce the condition. Cullen adds that because the Bank released his obligation of payment as Borrower, it released his obligation as guarantors because he did not guaranty Blackstone's obligations. Cullen also maintains that one cannot be a surety for one's own performance, citing, inter alia, Ford Motor Credit Co. v. Machias Ford, Mercury, Inc., 509 A.2d 658 (Me. 1986). He notes that "it is debatable whether the Debtor's personal guaranty of his own note to the Bank created an enforceable obligation at all."

B. The Bank

The Bank maintains that the prerequisites for releasing the Guaranty are set forth in ¶ 7(j) of the Loan Assumption Agreement and were never met. Accordingly, pursuant ¶ 2(a)(iii)(2) of the agreement, it never released Cullen, and his Guaranty remains in force. Specifically, citing SKW Real Estate L.P. v. Gold, 428 Mass. 520 (1998), it argues that under Massachusetts law, the Guaranty pursuant to its express terms is enforceable as a separate and distinct obligation from Cullen's obligation as a borrower and is not mere surplusage.

The Bank maintains that Cullen's Guaranty remains in effect pursuant to the unambiguous terms of the Loan Assumption Agreement, rejecting Cullen's position that because the condition of ¶7(j) was not satisfied as of the Effective Date, namely the execution of personal guaranties and submission of financial information by Lockwood and two others, his Guaranty was fully released. It argues that canons of contract construction require that ¶2(a)(iii)(2) cannot be read as superfluous, citing Fed. Deposit Ins. Corp. v. Singh, 977 F.2d 18, 22-23 (1st Cir. 1992). In its view, the unmet condition cannot render ¶2(a)(iii)(2) meaningless. It also points to the language of § 7(j) noting that it demonstrates the parties' intent that it was a future, conditional provision which only benefitted Cullen.

As an alternative, the Bank argues the even if the Court were to find that the Loan Assumption Agreement was ambiguous, the ambiguity must be resolved in light of the undisputed conduct of the parties. It asserts that the Bank and Cullen acted as if the conditions were ongoing future conditions and that Cullen believed that he remained liable on the Guaranty, at least prior to the commencement of his bankruptcy case. McGrane was in contact with Lockwood for months after the execution of the Loan Assumption

Agreement, and Cullen's counsel contacted the Bank a number of times to ascertain the status of the new guaranties. Finally, the Bank rejects Cullen's argument that it waived the requirements of ¶ 7(j), stating "any waiver would operate only as to the possibility of substitute New Guarantors, and not the complete release of the Debtor's Guaranty, as the Guaranty was expressly retained by ¶2(a)(iii)(2)."

## IV. DISCUSSION

### A. Summary Judgment Standard

The court in <u>Mitchell v. Wells Fargo Bank, N.A. (In re Mitchell)</u>, 476 B.R. 33 (Bankr. D. Mass. 2012), recently set forth the applicable summary judgment standard:

> Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), made applicable by Fed. R. Bankr. P. 7056. A "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences," could resolve in favor of the nonmoving party. <u>Triangle Trading Co. v. Robroy Indus., Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1999) (quoting <u>Smith v. F.W. Morse & Co., Inc.</u>, 76 F.3d 413, 427 (1st Cir. 1996)). "Material" means that a disputed fact has "the potential to change the outcome of the suit" under the governing law if the dispute is resolved in favor of the nonmovant. <u>McCarthy v. Nw. Airlines, Inc.</u> 56 F.3d 313, 314–15 (1st Cir.1995).

<u>Mitchell</u>, 467 B.R. at 42. *See also* <u>Petrucelli v. D'Abrosca (In re D'Abrosca)</u>, No. 10-062, 2011 WL 4592338 at *4 (B.A.P. 1st Cir. 2011). In <u>D'Abrosca</u>, the bankruptcy appellate panel noted that the moving party bears the initial burden with respect to a genuine dispute and, if that burden is satisfied, the burden shifts to the nonmovant to show that genuine issues of material fact exist.

For the reasons set forth below, the Court finds that the Bank satisfied its burden and

is entitled to summary judgment. As noted above, Cullen failed to submit a concise statement of material facts of record as to which he contends there exists a genuine issue of material fact to be tried, and the Lowenstein's Affidavit is insufficient to create a genuine issue of material fact, particularly where Cullen was represented by an attorney and admitted in his deposition testimony in In the Matter of the Tax Liability of Robert E. Lockwood, Boston Financial Corporation and Blackstone Financial Holdings, LLC that he had continued obligations under the Guaranty.

    B. Applicable Law

A proof of claim filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes "prima facie evidence of the validity and amount of the claim." 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). "Presumptive validity adheres to the proof of claim until it is met with an objection supported by 'substantial evidence.'" In re Perron, 474 B.R. 310, 313 (Bankr. D. Me. 2012)(citing Juniper Dev. Group v. Kahn (In re Hemingway Transport, Inc.), 993 F.2d 915, 925 (1st Cir.1993), *cert. denied*, 510 U.S. 914 (1993); In re Allegheny Intern., Inc., 954 F.2d 167, 173 (3rd Cir. 1992); In re Organogenesis Inc., 316 B.R. 574, 583 (Bankr. D. Mass. 2004)). *See also* Am. Express Bank, FSB v. Askenaizer (In re Plourde), 418 B.R. 495, 504 (B.A.P. 1st Cir. 2009).

Section 502(b) provides that the bankruptcy court "shall allow" a claim unless one of nine enumerated exceptions apply. Courts disagree as to whether 11 U.S.C. § 502(b) sets forth the exclusive bases upon which a claim may be disallowed. *See* In re Plourde, 418 B.R. at 504 n.12 (collecting cases); B–Real, LLC v. Melillo (In re Melillo), 392 B.R. 1 (B.A.P. 1st Cir.

2008). Because this Court intends to overrule Cullen's objection to the Bank's proof of claim, it follows that the Bank's objection to confirmation must be sustained as Cullen has failed to provide for the claim in his Chapter 13 plan.

C. Analysis

Although Cullen does not reference § 502(b) in his submissions, that section provides in pertinent part:

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that— . . . (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured . . . ."

11 U.S.C. § 502(b)(1). Cullen relies upon the provisions of the Loan Assumption Agreement for purposes of rendering his obligations under the Guaranty unenforceable.

The Loan Assumption Agreement was not a model of draftsmanship. It contains three conditions to the consent of the Bank to the *transfer* of the Property, including the condition that "Assignor remains liable personally under the terms of the Loan as a Guarantor pursuant to the Guaranty executed by the Assignor in connection with the Loan." In addition, the agreement contains 11 "conditions precedent to the Bank's approval of the *assumption* of the Loan by Assignee under this Agreement," (emphasis supplied) including the execution of New Guaranties. The Effective Date of the Loan Assumption Agreement was tied to the satisfaction of all conditions. Despite the failure of Lockwood, Jeffrey Horvitz and Michele Shafmaster to execute guaranties, all parties performed under the Loan

Assumption Agreement. The Bank consented to the transfer of the Property and Cullen, in fact, executed a deed to Blackstone; Blackstone made payments to the Bank and the Bank accepted payments.

Although Cullen argued that he received no consideration for his release of claims against the Bank, claims which he did not list on Schedule B-Personal Property and did not disclose or describe in his Memorandum, the Court disagrees. By executing the Loan Assumption Agreement and conveying the Property to Blackstone, Cullen relieved himself of his primary obligation under the note and mortgage to make monthly payments to the Bank, as well as payments to the Shipways Place Condominium Association and to the City of Boston for real estate taxes. In addition, he potentially relieved himself of any liability under his Guaranty in the event that Blackstone satisfied its payment obligations under the Loan Assumption Agreement on time and in full. Moreover, as the Bank points out, Massachusetts law is clear and does not prohibit deficiency judgments against guarantors who also are primary obligors.

According to the court in SKW Real Estate Ltd. Partnership v. Gold, "[s]ome States have enacted 'anti-deficiency' laws which operate to prohibit or limit deficiency judgments following foreclosure, and courts in those jurisdictions generally do not permit deficiency judgments against guarantors who were also makers." 428 Mass. 520, 523 (1998)(citing Union Bank v. Dorn, 254 Cal. App.2d 157, 159, 61 Cal. Rptr. 893 (1967); Valinda Bldrs., Inc. v. Bissner, 230 Cal. App.2d 106, 111, 40 Cal. Rptr. 735 (1964); and Fed. Deposit Ins. Corp. v. Singh, 977 F.2d 18, 25 n. 10 (1st Cir. 1992)). The court in SKW determined, however, that

"Massachusetts has no such law, and we are not persuaded by the defendants' attempts to broaden the scope of [Mass. Gen. Laws ch. 244,] § 17B to include such a policy,"adding that § 17B, which was designed to protect mortgagors and those liable with them, was unambiguous and did not provide a guarantor with the same protections afforded those primarily liable on a note, even if the guarantor was also the primary obligor of the instrument." 428 Mass. at 524 (footnote omitted).

Cullen also argues that summary judgment is unwarranted because the Loan Assumption Agreement is ambiguous. In Fed. Deposit Ins. Corp. v. Singh, the court set forth the law governing determinations of ambiguity:

> "The question of whether a contract term is ambiguous is one of law for the judge." Allen [v. Addage, Inc.], 967 F.2d 695 at 698 [(1st Cir. 1992)]; *accord* Boston Five Cents Sav. Bank [v. Sec'y of Dep't. of HUD], 768 F.2d 5 at 8 [(1st Cir. 1985)]; Jefferson Ins. Co. v. Holyoke, 23 Mass. App. Ct. 472, 503 N.E.2d 474, 476 n. 4, *rev. denied*, 399 Mass. 1104, 506 N.E.2d 146 (1987). *A contract is not ambiguous simply because litigants disagree about its proper interpretation. See* Papago Tribal Util. Auth. v. FERC, 723 F.2d 950, 955 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). Rather, a contract, or a set of documents which in the ensemble comprise a contract, is considered ambiguous only when the language "is reasonably prone to different interpretations." Fowler v. Boise Cascade Corp., 948 F.2d 49, 54 (1st Cir.1991). Stated another way, contract language which "is susceptible to differing, but nonetheless plausible, constructions . . . is ambiguous." Allen, 967 F.2d at 700; *see also* Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir.1989).

Singh, 977 F.2d at 22 (emphasis supplied).

As the Court observed above, the Loan Assumption Agreement is not a model of good draftsmanship. The references to conditions precedent and the Effective Date obscure, but do not obviate, the significance of the integration clause, which provided that the Agreement, the Loan Documents and the exhibits constituted the entire agreement of the

18

parties and superseded and canceled any and all previous negotiations, and § 2(a)(iii)(2), which expressly provides for the continuation of the Guaranty. In this Court's view, § 7(j), which was in the nature of separate covenant rather than a condition precedent, together with § 2(a)(iii)(2) do not create ambiguity because the language of the contract considered through the lens of the parties' performance unequivocally establishes what the parties meant. *See* Martion v. First Nat'l Bank of Boston, 361 Mass. 325, 332 (1972)("'There is no surer way to find out what parties meant, than to see what they have done.'")(quoting Pittsfield & N. Adams R.R. v. Boston & Albany R.R., 260 Mass. 390, 398 (1927), and Brooklyn Life Ins. Co. of N.Y. v. Dutcher, 95 U.S. 269, 273 (1877)). Moreover, in the absence of ambiguity and in view of the integration clause, the parole evidence rule "'bars evidence of prior or contemporaneous written or oral arguments that contradict, vary or broaden an integrated writing.'" R & R Chemicals, LLC. v. Cellect, LLC., No. 01-11623-PBS, 2002 WL 2018725 at *4 (D. Mass. 2002)(citing Berezin v. Regency Bank, 234 F.3d 68, 72 (1st Cir.2000), and Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496, 678 N.E.2d 180, 184 (1997)). Accordingly, this Court need not consider Lowenstein's Affidavit.

The execution of new guaranties by Lockwood, Jeffrey Horvitz and Michele Shafmaster clearly was designed to benefit both the Bank and Cullen. Obviously, execution of the new guaranties would relieve Cullen of a contingent liability in the event Blackstone defaulted. Similarly, in view of Cullen's defaults, new guaranties would provide assurance to the Bank. Consistent with that interpretation, both the Bank and Cullen's attorney corresponded with Lockwood to obtain his personal guaranty. The continuation of Cullen's

Guaranty also benefitted the Bank.  Both the Bank and Cullen could and did waive the execution of the new guaranties and undertook performance of their obligations under the Loan Assumption Agreement without regard to § 7(j)'s designation of the execution of the new guaranties as a condition precedent.  In view of the complete absence of any provisions in the Guaranty and the Loan Assumption Agreement that the Bank intended to release Cullen from his Guaranty without the execution of new guaranties, Cullen's position that his Guaranty became a nullity is little more than wishful thinking.  As the Bank recognizes, "'It is a canon of construction that every word and phrase of an instrument is if possible to be given meaning, and none is to be rejected as surplusage if any other course is rationally possible.'" Fed. Deposit Ins. Corp. v. Singh, 977 F.2d at 22 (quoting Tupper v. Hancock, 319 Mass. 105, 108 (1946)).  Accordingly, the Court rules that §2(a)(iii)(2) has independent legal significance particularly when considered in light of the provisions of the Guaranty itself which are set forth in detail above.  As Cullen submitted no evidence of fraud in the inducement or a violation of Ch. 93A, the Court rejects those allegations.

## V. CONCLUSION

In view of the foregoing, the Court shall enter an order overruling the Objection to the Bank's proof of claim and allowing the claim in the sum of $205,140.52.  The Court shall also enter an order sustaining the Bank's Objection to confirmation of Cullen's plan.

By the Court,

*[signature: Joan N. Feeney]*

Joan N. Feeney
Dated: January 14, 2013            United States Bankruptcy Judge

20